UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID HARRISON,<br><br>  Plaintiff,<br><br>v.<br><br>AIRPORT TERMINAL SERVICES, INC.,<br><br>  Defendant. | Case No. 0:10-cv-01078-PJS-FLN<br><br>**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNT I OF PLAINTIFF'S COMPLAINT** |

## INTRODUCTION

Plaintiff David Harrison ("Plaintiff") worked as a ramp agent and ramp lead for Defendant Airport Terminal Services, Inc. ("ATS" or "Defendant") at the Minneapolis-St. Paul International Airport ("MSP"). His employment was terminated for a safety violation committed shortly after receiving a safety directive issued to all employees that prohibited the exact conduct that led to his discharge. Plaintiff now brings this action alleging ATS failed to pay him for all hours worked, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and the Minnesota Fair Labor Standards Act, Minn. Stat. § 177.254.

Plaintiff's claim pursuant to the FLSA, however, fails as a matter of law because Plaintiff's employment, and that of all other similarly situated employees, is exempt from the overtime provisions of the FLSA because Plaintiff is an employee of a common carrier by air. Defendant provides ramp services for AirTran Airways at MSP, which are services traditionally performed by employees of the airlines, or carriers,

themselves. In addition, the carrier Defendant services at MSP exercises a significant amount of control over ATS and its employees, rendering Defendant a "common carrier" under the Railway Labor Act, 45 U.S.C. § 181 *et seq.* ("RLA").

Because ATS meets the requirements to be considered a common carrier under the RLA, and because the FLSA specifically exempts employees of carriers subject to the provisions of the RLA from its maximum hour and overtime provisions, Plaintiff's FLSA claim fails as a matter of law, and Defendant is entitled to summary judgment on Count I of Plaintiff's Complaint.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Defendant is a member of the Aviance Alliance which serves 35 airports in the United States and Canada with over 1,800 employees (Declaration of James Murphy ("Murphy Decl.") ¶ 4, attached hereto as Exhibit A).

2. Defendant's business is contracting with airlines to provide passenger service, ramp handling, aircraft cabin cleaning, cargo services, and aircraft fueling services (Murphy Decl. ¶ 5).

3. At MSP, Defendant provides ramp services for AirTran Airways ("AirTran") (Murphy Decl. ¶ 6).

4. At MSP, Defendant employs 19 people: 13 as ramp agents, 1 as a ramp lead, 4 as ramp supervisors, and 1 as a station manager (Murphy Decl. ¶ 7; Declaration of Colleen Shellum ("Shellum Decl.") ¶ 5, attached hereto as Exhibit B).

5. The essential job responsibilities of the ramp agent position are: marshalling inbound aircraft into the ramp area of the assigned gate; unloading baggage

from aircraft bins; delivering bag carts to the bag room and unloading bag carts onto the conveyor belts for passenger pick-up; grooming overnight aircrafts, which includes cleaning lavatories, seat pockets, tray tables, overheads, floors, galleys and trash; pushing outbound aircraft out of the gate area; performing foreign object damage walks in the ramp area between flights; ensuring necessary ground equipment is available in ramp area and bag room for upcoming flights; and performing administrative duties (Murphy Decl. ¶ 8; Shellum Decl. ¶ 6).

    6. The essential job responsibilities of the ramp lead position include all the same duties as the ramp agent position, as well as the following: assigning duties and tasks to ramp agents for each flight; performing pre- and post-flight briefings; interpreting rules and policies for subordinates; issuing commendations and safety citations as needed; ensuring compliance with safety policies and procedures; maintaining working relationships with customer(s); providing prompt responses to service requests; and reporting load distribution for weight and balance (Murphy Decl. ¶ 9; Shellum Decl. ¶ 7).

    7. The essential job responsibilities of the ramp supervisor position include all the same duties as the ramp agent position, as well as the following: knowing contract requirements and customer expectations; supervising the use of manpower and equipment to efficiently complete tasks as directed by the carrier (AirTran); ensuring employee compliance with policies and procedures; communicating with employees on questions regarding policies and procedures; monitoring and/or conducting required training of employees; ensuring all AirTran-required training is completed successfully;

employee counseling and discipline as necessary; ensuring security of company funds, supplies and equipment; maintaining working relationships with AirTran and providing prompt responses to service requests; and ensuring all maintenance procedures are done on each shift (Murphy Decl. ¶ 10; Shellum Decl. ¶ 8).

    8. The essential job responsibilities of the station manager position are: understanding contract requirements and AirTran customer expectations; ensuring all AirTran contract requirements are met; knowing budgetary and financial responsibilities; determining and maintaining appropriate level of personnel and equipment to meet contract requirements; planning and organizing employee and equipment work schedules; monitoring and/or conducting required training of personnel; providing employee counseling and discipline as needed; ensuring compliance with safety policies and procedures; and maintaining working relationships with AirTran and providing prompt responses to service requests (Murphy Decl. ¶ 11; Shellum Decl. ¶ 9).

    9. The job duties performed by ramp agents, ramp leads, ramp supervisors and station managers are typical duties performed by ramp service professionals (Murphy Decl. ¶ 12).

    10. ATS' ramp agent and ramp lead positions are jobs traditionally performed by employees of the airlines, or carriers, themselves (Murphy Decl. ¶ 13).

    11. AirTran contracts with ATS to perform ramp services at MSP that were traditionally performed by employees of the carriers (Murphy Decl. ¶ 14; Shellum Decl. ¶ 10).

12. AirTran has substantial input at its discretion into the hiring of ATS employees in leadership roles and actually exercises that right, including most recently with respect to the hiring of the current station manager, the highest level position at MSP, and has the authority at its discretion to review and approve the qualifications of any ATS employee at MSP before final hiring decisions are made (Murphy Decl. ¶ 15).

13. AirTran requires ATS employees to take annual training courses on AirTran's procedures and standards concerning towing in aircraft; loading, stowing and securing baggage loads in the aircraft; delivering inbound baggage; preparing bulk baggage (oversize luggage) for delivery onto flights; and operating heating units and de-icing units (Murphy Decl. ¶ 16).

14. To make sure ATS employees are properly trained, AirTran trains the ATS Safety and Training Officer, who then relays the appropriate training to the ATS employees at MSP (Murphy Decl. ¶ 17; Shellum Decl. ¶ 11).

15. Some of Defendant's employees are trained directly by AirTran at MSP on the proper procedure to brake ride the aircraft (Murphy Decl. ¶ 18; Shellum Decl. ¶ 12).

16. AirTran requires ATS to maintain training records on all required training for all ATS employees at MSP (Murphy Decl. ¶ 19; Shellum Decl. ¶ 13).

17. AirTran may access training records of ATS employees at AirTran's discretion (Murphy Decl. ¶ 20; Shellum Decl. ¶ 14).

18. AirTran's station manager conducts regular audits of ATS training records (Murphy Decl. ¶ 21; Shellum Decl. ¶ 15).

19. AirTran requires ATS to create the following types of records: mishandling reports, accident reports, required training records, and records of ATS employees who are authorized to drive equipment on the ramps, and holds ATS accountable for on time performance (Murphy Decl. ¶ 22).

20. AirTran sets performance standards and goals for ATS (Murphy Decl. ¶ 23).

21. Specifically, AirTran sets performance standards and dictates the proper procedures on towing in aircraft; unloading baggage from aircraft; loading, stowing and securing baggage loads in the aircraft; delivering inbound baggage; preparing bulk baggage (oversize luggage) for delivery onto flights; operating heating units and de-icing units; marshalling and parking aircraft; moving of aircraft; interior turn and overnight cleaning; and safety measures (Murphy Decl. ¶ 24).

22. ATS employees' schedules at MSP are based *entirely* upon AirTran flight schedules (Murphy Decl. ¶ 25; Shellum Decl. ¶ 16).

23. AirTran requires ATS to provide sufficient manpower to provide the services required during a given shift and the number of ATS employees working during each shift is therefore dependant upon AirTran's work requirement (Shellum Decl. ¶ 17).

24. AirTran has the right to require ATS employees to work overtime, which frequently occurs when necessitated by AirTran flight delays or diversions (Murphy Decl. ¶ 26; Shellum Decl. ¶ 18).

25. Each day, the ATS station manager meets with AirTran management regarding flight schedules or special circumstances. The daily work performed by ATS

employees is reviewed and plans for future work are determined at these meetings and are designed to meet AirTran's needs (Shellum Decl. ¶ 19).

26. AirTran communicates directly with ramp supervisors and ramp leads. The supervisors and leads must always have their radios on in order to receive instructions and service requests from AirTran (Murphy Decl. ¶ 27; Shellum Decl. ¶ 20).

27. The equipment ATS purchases and uses at MSP is determined and controlled by ATS' contractual arrangements with AirTran and the types of planes they use (Shellum Decl. ¶ 21).

28. ATS investigates and disciplines its employees based on reports or requests from AirTran (Murphy Decl. ¶ 28; Shellum Decl. ¶ 22).

29. To cite an example, as a result of an AirTran audit on cleaning records, ATS recently suspended an employee who failed to meet AirTran's standards on cleaning and grooming an air conditioning unit (Murphy Decl. ¶ 29; Shellum Decl. ¶ 23).

30. ATS employees are also disciplined for violations of rules set by ATS, by AirTran and by the Federal Aviation Agency ("FAA") (Murphy Decl. ¶ 30).

31. AirTran has the right to request that ATS remove an employee from its account (Murphy Decl. ¶ 31).

32. If a request by AirTran to remove an employee from its account is reasonable and non-discriminatory, ATS honors such requests 100% of the time (Murphy Decl. ¶ 32).

33. Since AirTran is the only carrier with which ATS has a contract at MSP, a request to remove an employee from its account is effectively a request to discharge that employee (Murphy Decl. ¶ 33).

34. Plaintiff was hired by ATS on November 22, 2006 (Declaration of Peggy Hohl ("Hohl Decl.") ¶ 4, attached hereto as Exhibit C).

35. His employment was terminated on August 22, 2009 (Hohl Decl. ¶ 5).

36. During his employment with Defendant, Plaintiff worked as a ramp agent and ramp lead for AirTran (Murphy Decl. ¶ 34).

37. As a ramp agent, Plaintiff's basic job responsibilities were marshalling inbound aircraft into ramp area of assigned gate; unloading baggage from aircraft bins; delivering bag carts to bag room and unloading bag carts onto the conveyor belts for passenger pick-up; grooming overnight aircrafts; pushing outbound aircraft out of the gate area; performing foreign object damage walks in the ramp area between flights; ensuring necessary ground equipment was available in ramp area and bag room for upcoming flights; and performing administrative duties (Murphy Decl. ¶ 35).

38. As a ramp lead, Plaintiff's basic job responsibilities were the same duties as the ramp agent position, as well as the following: assigning duties and tasks to ramp agents for each flight; performing pre- and post-flight briefings; interpreting rules and policies for subordinates; issuing commendations and safety citations as needed; ensuring compliance with safety policies and procedures; maintaining working

relationships with AirTran and providing prompt responses to service requests (Murphy Decl. ¶ 36).

39. In his jobs as a ramp agent and ramp lead, Plaintiff performed duties typical of ramp service professionals (Murphy Decl. ¶ 37).

40. In his jobs as a ramp agent and ramp lead, Plaintiff performed duties traditionally performed by employees of the carriers themselves (Murphy Decl. ¶ 38).

41. In his jobs as a ramp agent and ramp lead, AirTran had significant control over Plaintiff's work in each of the ways set forth above (Murphy Decl. ¶ 39).

42. The control AirTran exercised over Plaintiff's work as a ramp agent and as a ramp lead included: dictating the types and frequency of training he received and regularly auditing training records; setting performance standards for his jobs as ramp agent and ramp lead; requiring that his schedule be based upon AirTran's flight schedules; its daily needs determining the number of ATS employees working per shift and occasionally requiring Plaintiff to work overtime; determining Plaintiff's day-to-day duties through daily communication with the ATS station manager; communicating directly with Plaintiff via radio when he was working as a ramp lead; and requiring Plaintiff to follow AirTran standards and rules (Murphy Decl. ¶ 40).

43. In general, ATS holds itself out to the public as offering its services to any airline or company that is interested in using its services (Murphy Decl. ¶ 41).

44. The duties performed by Plaintiff are integral to the overall services provided by ATS (Murphy Decl. ¶ 42).

45. The duties performed by employees similarly situated to Plaintiff are integral to the overall services provided by ATS (Murphy Decl. ¶ 43).

## ARGUMENT

### I. Summary Judgment is Proper Because Defendant Is Entitled to Judgment as a Matter of Law.

Pursuant to Fed. R. Civ. P. 56(e), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weber v. Am. Express Co.*, 994 F.2d 513, 515 (8th Cir. 1993). Summary judgment "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." *City of Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

In responding to a motion for summary judgment, Plaintiff "may not rely merely on allegations or denials," but "must set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Further, Plaintiff must do more than simply show there exists some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, he must set forth specific facts showing there is sufficient evidence to allow a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II. ATS and Its Employees are Subject to the Provisions of the Railway Labor Act.

Title II of the RLA states: "All of the provisions of subchapter I of this chapter… are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce… and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers." 45 U.S.C. § 181. Title I of the RLA defines the term "carrier" to include

> [A]ny company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilitates or performs any service… in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad…

45 U.S.C. § 151. Title II explicitly defines "carrier" to include airlines.

> The duties, requirements, penalties, benefits, and privileges prescribed and established by the provisions of subchapter I… shall apply to said carriers by air and their employees in the same manner and to the same extent as though such carriers and their employees were specifically included within the definition of "carrier" and "employee," respectively, in section 151 of this title.

45 U.S.C. § 182. The RLA defines the term "employee" to include "every person in the service of a carrier (subject to its authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official." 45 U.S.C. § 151.

An entity like ATS, which is not in the business of operating an airline, is subject to the RLA if it meets the requirements to be found a derivative carrier. The

11

National Mediation Board ("NMB")[1] and courts interpreting the jurisdictional language of the RLA apply a two-part test in determining whether an entity and its employees are subject to the RLA.  *District 6, Intl. Union of Industrial Service v. National Mediation Board*, 139 F. Supp. 2d 557, 561 (S.D.N.Y. 2001); *Verrett v. The Sabre Group, Inc.*, 70 F. Supp. 2d 1277, 1281 (N.D. Okla. 1999); *In re: Swissport USA, Inc.*, 35 N.M.B 190, 194 (2008); *In re: John Menzies PLC, d/b/a/ Ogden Ground Servs., Inc.*, 30 N.M.B. 463, 472-73 (2003).

First, the NMB determines whether the nature of the work is that traditionally performed by employees of rail or air carriers (the function test).  *Swissport*, 35 N.M.B. at 194-95; *District 6, Intl. Union of Industrial Service*, 139 F. Supp. 2d at 561.  Second, the NMB determines whether the employer is directly or indirectly owned or controlled by, or under common control with, a carrier or carriers (the control test).  *Id.*  Both parts of the test must be satisfied for the entity and its employees to be subject to the RLA.  *Id.*

In this case, ATS employees perform work traditionally performed by employees of air carriers (Def. Facts ¶¶ 9-11).  In addition, ATS and its employees are under common control with the carrier it serves at MSP (Def. Facts ¶¶ 12-33).  Accordingly, as explained more fully below, ATS and its employees meet both prongs of the two-part test and are subject to the RLA.

---

[1] The NMB is the federal agency charged with the responsibility for labor-management relations in the rail and air transport industries.  *District 6, Intl. Union of Industrial Service*, 139 F. Supp. 2d at 559.

A.    **The Function Test.**

ATS employees perform ramp services for AirTran at MSP (Def. Facts ¶ 3). At MSP, Defendant employs 13 ramp agents, 1 ramp lead, 4 ramp supervisors and 1 station manager (Def. Facts ¶ 4). The main job duties of these positions include: marshalling inbound aircraft into the ramp area of an assigned gate; unloading baggage from aircraft bins; delivering baggage to bag room and unloading it onto the conveyor belts for passenger pick-up; grooming overnight aircraft; pushing outbound aircraft out of the gate area; and ensuring necessary ground equipment is available in the ramp area and bag room for upcoming flights (Def. Facts ¶¶ 5-8). These are typical duties performed by ramp service professionals (Def. Facts ¶ 9).

Moreover, these job duties are services traditionally performed by employees of the carriers themselves. *In re: Swissport USA, Inc.*, 35 N.M.B 190, 195 (2008) (finding the ramp agents and lead ramp agents in question performed "work that is traditionally performed by employees in the airline industry"); *In re: John Menzies PLC, d/b/a/ Ogden Ground Servs., Inc.*, 30 N.M.B. 463, 473 (2003) (same). Accordingly, Defendant qualifies as a carrier under the function prong of the two-part test. *District 6, Intl. Union of Industrial Service*, 139 F. Supp. 2d at 561.

B.    **The Control Test.**

The standard for satisfying the control prong of the two-part test is the degree of influence that a carrier or carriers has over the manner in which the company conducts its business in such areas as hiring, firing, wages, discipline and working conditions. *Swissport*, 35 N.M.B. at 195; *Ogden Ground Services*, 30 N.M.B. at 473-74.

The undisputed facts demonstrate that, at MSP, AirTran exercises a significant amount of control over the manner in which Defendant conducts its business and over the work performed by Defendants' employees.

AirTran has input into the hiring decisions made by Defendant (Def. Facts ¶ 12). Defendant consults with AirTran on the hiring of, and approves, ATS employees in leadership roles, and AirTran, at its discretion, reviews candidates' qualifications before final hiring decisions are made (Def. Facts ¶ 12). These types of activities have been found to constitute control in favor of RLA coverage. *See, e.g., In re: Bradley Pacific Aviation, Inc.*, 34 N.M.B. 119, 131-32 (2007).

AirTran requires ATS employees to take annual training courses on AirTran's procedures and standards concerning towing aircraft; loading, stowing and securing baggage loads in the aircraft; delivering inbound baggage; preparing bulk baggage (oversize luggage) for delivery onto flights; and operating heating units and de-icing units (Def. Facts ¶ 13). To ensure that ATS employees are properly trained, AirTran trains the ATS Safety and Training Officer, who then relays the appropriate training to the ATS employees at MSP (Def. Facts ¶ 14). AirTran may access training records of Defendant's employees at AirTran's discretion, and AirTran's station manager conducts regular audits of ATS training records (Def. Facts ¶¶ 17-18). AirTran also requires Defendant to create records of mishandling reports, accident reports and of employees authorized to drive equipment on the ramps and monitors On Time Performance (Def. Facts ¶ 19). These types of requirements have been found to constitute control in favor of RLA coverage. *Swissport*, 35 N.M.B. at 192, 195

(sufficient control found, in part, because carriers dictated training requirements for Swissport employees and conducted audits of Swissport records); *Bradley Pacific Aviation, Inc.*, 34 N.M.B. at 132 (sufficient control found, in part, because carriers trained Bradley employees as trainers, required Bradley to maintain records of employee training and audited those records); *In re: Aircraft Services International Group, Inc.*, 33 N.M.B. 200, 213 (2006) (sufficient control found, in part, because the carriers required ASIG employees to follow their operating and training procedures, ASIG to keep training records and had access to those records at their discretion).

AirTran sets performance standards and goals for ATS employees (Def. Facts ¶ 20). Specifically, AirTran sets performance standards and dictates the proper procedures on: towing in aircraft; unloading baggage from aircraft; loading, stowing and securing baggage loads in the aircraft; delivering inbound baggage; preparing bulk baggage (oversize luggage) for delivery onto flights; operating heating and de-icing units; marshalling and parking aircraft; moving of aircraft; interior turn and overnight cleaning; and safety measures (Def. Facts ¶ 21). These types of authority have been found to constitute control in favor of RLA coverage. *Swissport*, 35 N.M.B. at 195 (finding sufficient control, in part, because the carriers specified the way work was to be performed and had its own set of regulations and standards for work performance); *Ogden Ground Services*, 30 N.M.B. at 474 (finding sufficient control, in part, because the carriers required Ogden employees to follow the carriers' operating procedures).

ATS staffing is 100% dependent on AirTran's flight schedules and needs. Defendants' employees' schedules are based entirely on AirTran's flight schedules (Def.

Facts ¶ 22). AirTran has the right to require that the number of ATS employees working during a given shift meets its needs (Def. Facts ¶ 23). AirTran's needs also require ATS employees to work overtime when necessary (Def. Facts ¶ 24). Further, AirTran communicates directly with ramp leads and ramp supervisors throughout the shifts regarding service requests (Def. Facts ¶ 26). This type of dependence on the carriers' needs has been found to constitute control in favor of RLA coverage. *Swissport*, 35 N.M.B. at 193, 195 (carrier flight schedules dictated schedules of Swissport employees; carriers had daily input on staffing and manpower and could require Swissport employees to work overtime); *Ogden Ground Services*, 30 N.M.B. at 469, 474 (carrier flight schedules determined Ogden employee schedules and carriers could require Ogden employees to work overtime; carrier personnel communicated directly with Ogden ramp service agents about service needs).

ATS employees are disciplined for violations of rules set by ATS, by AirTran and by the FAA (Def. Facts ¶ 30). Defendant also disciplines its employees based on reports or requests from AirTran (Def. Facts ¶¶ 28-29). AirTran even has the right to request that an ATS employee be removed from its account, effectively asking ATS to discharge its own employee, and ATS honors such requests (Def. Facts ¶¶ 31-33). These types of authority have been found to constitute control in favor of RLA coverage. *Swissport*, 35 N.M.B. at 194 (carriers had the right to request that Swissport remove a Swissport employee from their account or discipline an employee); *Ogden Ground Services*, 30 N.M.B. at 469, 474 (carriers required Ogden to comply with requests to reassign or remove an Ogden employee, even if it meant the employee must be

discharged); *Aircraft Services International Group, Inc.*, 33 N.M.B. at 213 (ASIG complied with carrier requests to discipline and reassign ASIG employees).

The evidence in the record clearly establishes that AirTran exercises a significant amount of control over ATS and its employees at MSP. AirTran has control over ATS in the areas of hiring, staffing, training, recordkeeping, performance and discipline and firing. Thus, Defendant qualifies as a carrier under the control prong of the two-part test. *See, Swissport*, 35 N.M.B. 190; *Ogden Ground Services*, 30 N.M.B. 463; *Bradley Pacific Aviation, Inc.*, 34 N.M.B. 119; *Aircraft Services International Group, Inc.*, 33 N.M.B. 200. Moreover, because ATS meets the requirements of both the function and control prongs, ATS is a common carrier subject to the RLA. *Verrett*, 70 F. Supp. 2d at 1283; *District 6, Intl. Union of Industrial Service*, 139 F. Supp. 2d at 562.

### C.    ATS Offers its Services to the Public.

Although the Eighth Circuit has not addressed the issue, other federal circuits have held that in order to qualify as a carrier subject to the RLA, a company must hold itself out to the public as offering its services indiscriminately. *Thibodeaux v. Executive Jet Intl., Inc.*, 328 F.3d 742, 750 (5th Cir. 2003); *Valdivieso v. Atlas Air, Inc.*, 305 F.3d 1283, 1286-87 (11th Cir. 2002). The Fifth Circuit has held that "'the crucial determination in assessing the status of a carrier is whether the carrier has held itself out to the public or to a definable *segment* of the public as being willing to [work] for hire, indiscriminately.'" *Thibodeaux*, 328 F.3d at 750, quoting *Woolsey v. National Transportation Safety Board*, 993 F.3d 516, 523 (5th Cir. 1993) (emphasis in original). In *Valdivieso* the Eleventh Circuit agreed, and found that the defendant was a common

carrier because it "offer[ed] its services indiscriminately to anyone willing to accept its terms and prices." *Valdivieso*, 305 F.3d at 1287.

Under this standard adopted by the Fifth and Eleventh Circuits, Defendant qualifies as a common carrier subject to the RLA. Defendant holds itself out to the public as offering its services to any airline or company that is interested in contracting with it (Def. Facts ¶ 43). The duties performed by Plaintiff and similarly situated ramp service employees are integral to the overall services provided by ATS to AirTran at MSP, and to other airlines it services in other airports (Def. Facts ¶¶ 44-45). Under any test to determine carrier status, ATS qualifies as a common carrier by air subject to the RLA.

### III. Because ATS and Its Employees are Subject to the RLA, They Are Exempt From The Overtime Provisions of the FLSA.

The exemption section of the FLSA specifically provides that "[t]he [maximum hour] provisions of section 207 of this title shall not apply with respect to… any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act." 29 U.S.C. § 213(b)(3). Courts consistently hold that employees of carriers subject to the RLA are exempt from the maximum hour and overtime provisions of the FLSA. *See, e.g., Thibodeaux,* 328 F.3d at 753 (holding that the defendant "qualifies as a 'common carrier' and is therefore subject to Title II of the RLA. And because it is subject to the RLA, [defendant's] employees are exempt from the overtime provisions of the FLSA"), citing *Woolsey*, 993 F.3d 516; *Valdivieso*, 305 F.3d 1283 (affirming grant of summary judgment to defendant because it is a common carrier subject to the RLA and

exempt from the FLSA); *Slavens v. Scenic Aviation, Inc.*, 221 F.3d 1353 (10th Cir. 2000) (same); *Caggianiello v. FSG Privatair, Inc.*, 2007 WL 1058473 (D. Conn. April 6, 2007) (same).

ATS and its employees are likewise exempt from the maximum hour and overtime provisions of the FLSA. As established above in Section II, Defendant is a carrier subject to the provisions of the RLA. Thus, Plaintiff and all similarly situated employees are exempt from the FLSA. 29 U.S.C. § 213(b)(3); *Thibodeaux*, 328 F.3d at 753; *Valdivieso*, 305 F.3d 1283. Accordingly, Plaintiff's FLSA claim necessarily fails, and Defendant is entitled to judgment as a matter of law.

## CONCLUSION

Because no genuine issue of material fact exists as to Plaintiff's FLSA claim and Airport Terminal Services, Inc. is entitled to judgment as a matter of law, Defendant is entitled to summary judgment on Count I of Plaintiff's Complaint pursuant to Fed. R. Civ. P. 56, and for such other and further relief as the Court deems just and proper.

Dated May 14, 2010	Respectfully submitted,

OGLTREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.


s/Cynthia A. Bremer
Cynthia A. Bremer, #273119
Kelly A. Moffitt, #341009
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN 55402
Tel:   (612) 339-1818
Fax:   (612) 339-0061

*~ and ~*

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Gregg M. Lemley, admitted *pro hac vice*
Heidi Kuns Durr, admitted *pro hac vice*
Erin E. Williams, admitted *pro hac vice*
7700 Bonhomme Avenue, Suite 650
St. Louis, MO 63105
Tel:   (314) 802-3935
Fax:   (314) 802-3936

**Attorneys for Defendant**

8433804.3 (OGLETREE)